Milton Ray BARTON and Leslie McCullem Mitchell, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17093.

United States Court of Appeals Fifth Circuit.

Feb. 26, 1959.

Howard H. Dailey, Dallas, Tex., Jerry D. Brownlow, Brownlow & Bailey, Grand Prairie, Tex., for appellants.

Minor L. Morgan, Asst. U. S. Atty., Dallas, Tex., William B. West, III, U. S. Atty., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

The indictment under the Mann Act[1] charged in the first count that "on or about October 7, 1957," Milton Ray Barton and Leslie McCullem Mitchell transported in interstate commerce from Dallas, Texas, to Hobbs, New Mexico, "one Carolyn Anita McQueary, a girl," for the purpose of prostitution. The second count was the same, except it specified a different date, "on or about November 1, 1957," and a different female, "one Betty Jean Lane, a woman." The jury found each defendant guilty on both counts as charged, and the court sentenced each of them to imprisonment for a total of seven and one-half years. Both defendants appealed, but Barton has withdrawn his appeal and is now serving his sentence.

Before the trial Mitchell moved for a severance, attaching to his motion a copy of an unsigned statement given by his codefendant Barton, out of Mitchell's presence and hearing, to a Special Agent of the F.B.I.[2] The district court ruled on the motion for severance as follows:

"Prior to leaving Dallas, my wife Bobbie Barton, had left me and had taken my car, and therefore Mitchell and I agreed to make the trip in his 1955 Lincoln. On or about October 7, 1957, the three of us, Mitchell, McQueary, and myself, left Dallas in Mitchell's car, bound for Hobbs, New Mexico. We went to Grand Prairie, where we picked up some of McQueary's clothes. We left from Dallas about noon, or shortly after. Shortly after leaving Grand Prairie, Mitchell asked McQueary if she would like to make some money by filling dates of prostitution and she agreed to this. Mitchell said he knew where she could make such money in Hobbs, New Mexico, at the La Miradora Motel. Mitchell said he knew the porter who could arrange for the dates, and that he had worked a girl at this motel before. He said this girl was Betty Jean Foster, his step-daughter.

"We went to Midland, Texas, where I attempted to recover my car from my wife, but was unsuccessful. We stayed that night in the Triple D Motel, where we stayed in rooms 18 and 19. We left Midland the next day, and proceeded to Hobbs, New Mexico, where we checked into the La Miradora Motel in rooms 11 and 12. While on this trip, both Mitchell and myself paid for the expenses of the trip.

"Shortly after arriving, Mitchell talked to the Negro porter, Norman Gordon. A short time after this, Gordon came to

---

**1.** In pertinent part as follows:

"§ 2421. *Transportation generally*

"Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice;

\* \* \*

\* \* \* \* \*

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

18 U.S.C.A. § 2421.

**2.** The main body of that statement was as follows:

"About one week later, at the same drive-in, Mitchell suggested to McQueary and myself that we go to New Mexico together on a selling trip. Mitchell told us he had been to New Mexico before. Mitchell also suggested that I get a girl to take with us to help make some money. Mitchell and I agreed to take two cars, his 1955 blue Lincoln, and my 1957 black and white Mercury. Also during the time, when Mitchell and I were making plans for the trip, we both discussed the possibility of McQueary making money for us by filling dates of prostitution in New Mexico.

"I believe we can control the evidence without a severance, and having two trials, so I will overrule the motion."

The Government stipulated that Mitchell was not present when Barton gave the statement. Upon the trial and just before the statement was offered in evi-

our room and told us he had a 'date' ready for McQueary in room 6. McQueary went with Gordon to room 6 and filled this date of prostitution. She returned later with $5.00, which she gave to Mitchell. During the next four days, McQueary was filling an average of about four dates a night at the motel. During this time, McQueary made about $80.00 which Mitchell and I split and paid for living expenses for all of us. At this time I left Hobbs, to see about my car. I was in Dallas about four days, and then returned alone to Hobbs. When I got back I found out Mitchell had bought McQueary some clothes out of the money she made from her dates of prostitution. She had about $26.00 left, which Mitchell and I split for living expenses. The three of us stayed at this motel for about two weeks, during which time McQueary was filling about four dates of prostitution a night at the motel. After the porter had been paid his 40% out of her proceeds, Mitchell and I split the remainder.

"About the first part of November, 1957, the three of us moved into an apartment at 803 South Dalmont St., Hobbs. We stayed at this place about twenty-two days. A week after we moved in, we got a telephone EX–39093, installed. During this first week, McQueary did not fill any dates of prostitution. After we got the telephone, McQueary filled several dates of prostitution at some motels and hotels, and at 803 South Dalmont. I recall she filled some dates at the Hardin Hotel. This (sic) call-dates were arranged by Mitchell who had given our telephone number to the porters and bell-hops in the hotels and motels. I had accompanied Mitchell when he has (sic) made these arrangements. When she got a call, she sometimes went by taxi, sometimes I took her to the hotel or motel, or Mitchell would.

"About seven days after we moved into 803 South Dalmont, I returned to Dallas, alone, in Mitchell's car, again to see about my car. Three days later I returned to Hobbs. Shortly after this, Mitchell and I both went to Dallas in his car. Before leaving, Mitchell had said he wanted to get his step-daughter up to Hobbs, and put her to work filling dates of prostitution, as with two girls 'hustling', we could make more money. This trip occurred in the latter half of November, 1957: Upon arriving in Dal-

las, we located Mitchell's step-daughter, Betty Jean Foster, living on South Grand Avenue, just off of Ervay St., on the north side of the street. Mitchell asked Foster if she wanted to take a trip, and she said she was ready. I understood from their conversation that both Mitchell and Foster knew the purpose of the trip, as Mitchell had previously told me that he had 'hustled' Foster in Hobbs. We left from Dallas late that same night, and drove straight through to Hobbs, via Ft. Worth and Weatherford and Snyder and Seminole, Texas. During this trip Mitchell told Foster he wanted her to just give him enough from her prostitution dates so that he could make expenses. He also mentioned she make dates at the La Miradora.

"We arrived in Hobbs about noon the next day, and the next night Foster was taken to the La Miradora Motel to fill a date of prostitution, by Mitchell. Foster lived with the three of us at 803 South Dalmont about a week, during which time she was filling prostitution dates at various hotels and motels. I do not know how much she made, as she gave all her money to Mitchell. Foster left Hobbs and returned to Dallas by bus. The ticket for this trip was bought for Foster by Mitchell. About this time Mitchell, McQueary and I moved into a house up the street, on Dalmont Street. We lived at this address about nine days, and it was during this time that I took McQueary to Carlsbad, New Mexico, to the Crawford Hotel. I took her there because Mitchell had made a contact with the porter at this hotel for her to fill prostitution dates. We left her there, and she stayed about six days. While she was there Mitchell and I returned to Dallas, as I needed some money, and I borrowed $100.00 from my mother, Lelia Hester, 1646 Small St., Grand Prairie. We were in Dallas about five days, and then returned to Hobbs. A day after we arrived, I went alone to Carlsbad to pick up McQueary. While in Carlsbad, I received a phone call from Mitchell telling me not to return to Hobbs as there were some people there looking for me. I knew he meant police officers. McQueary and I then directly to El Paso, Texas, where we stayed that night in a motel. The next day we went back to Hobbs to get our clothes. Mitchell was not there at the time. McQueary and I then proceeded

dence, Mitchell renewed his motion for severance. In lieu of granting that motion the district court instructed the jury as follows:

> "Gentlemen of the Jury, counsel is now somewhat showing the origin of the statement. If it is offered in evidence before you the Court will admit it only as evidence against the defendant that made it.
>
> "If two men are engaged in a transaction and one of them makes a confession, it is admissible against him, and not against the other fellow. So while this admission may contain the name of Mitchell again and again, you will not consider that as part of the evidence against Mitchell, and the paper is offered in evidence only insofar as it shows evidence against Barton."

Over Mitchell's objection, Barton's statement, thus limited, was introduced in evidence.

At the conclusion of the Government's evidence, Mitchell again renewed his motion for severance and said motion was again denied.

The defendant Barton did not testify upon the trial either as a Government witness or for himself.

The district court further instructed the jury in reference to the statement in its final oral charge as follows:

> "During the trial there was admitted a written paper purporting to be the written statement of one of the defendants, the defendant Milton Ray Barton, an admission, as we told you at the time, or confession of one man, if you might call it that. Any statement made by one defendant is not admissible against the other, so that was admitted against one of the defendants and not against them both. On that point, Counsel has asked me to charge you again on that point. You are charged as part of the law applicable to the case that you cannot consider the purported voluntary statement alleged to have been made by the defendant Barton as any evidence whatever against his co-defendant, Mr. Mitchell. Insofar as Mitchell is concerned, you will disregard this statement altogether, and if you consider it at all against the defendant Barton you must first find the evidence in the case, beyond a reasonable doubt, that said purported statement was freely and voluntarily given by the party."

The Government relies upon the familiar principle that, under Rule 14, Federal Rules of Criminal Procedure,[3] the district court has a discretion to grant or deny a severance of defendants, and that its ruling is subject to review only for abuse of discretion.

We have quoted the main body of Barton's statement in footnote 2, supra. It accused Mitchell of being the instigator or of acting with Barton in every detail of the commission of each offense. It

---

back to Grand Prairie, where I rented a house at 2504 Pine St. We lived there as man and wife until I was arrested on December 30, 1957. At the time I picked up McQueary in Carlsbad, she gave me $111.00 which she had made from prostitution dates.

"On December 28, 1957, McQueary and I had an argument and during this I struck her several times.

"While on the original trip to Hobbs, Mitchell and I explained some of the things McQueary would have to do in filling dates of prostitution. The porter at the La Miradora also explained some of the things she would have to do.

"I wish to state that the sole purpose of the original trip to New Mexico in early October, 1957, was for McQueary to fill dates of prostitution in New Mexico and by which we all could make some money. I knew that I was doing wrong in making this trip as such a trip was in violation of the law."

3. "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." 18 U.S.C.A.

would be impossible to eliminate from the statement the parts prejudicial to Mitchell and no such attempt was made. The sole reliance for Mitchell's protection was the court's instruction to the jury, several times repeated, not to treat the statement as evidence against Mitchell. Considering the substance and terms of Barton's statement, we doubt whether it was at all possible to carry out that instruction. To do so certainly would require twelve minds more perfectly disciplined than those of the average human jurors.

Unless that admonition was effective, then Mitchell has been deprived of his constitutional right to be confronted with the witnesses against him,[4] for he has been afforded no opportunity to cross-examine Barton as to the truthfulness of his many accusatory statements.

A few of the States grant a right of separate trial to every defendant in a criminal case, and several other States have liberal rules for the granting of severance in order to assure a fair trial to each defendant.[5] The federal courts retain the discretionary rule expressed in Rule 14, Federal Rules of Criminal Procedure, quoted in footnote 3, supra, but they must nonetheless be alert to accord to every defendant a completely fair trial.[6] For reasons which have been adequately expressed in Schaffer v.

United States, 5 Cir., 1955, 221 F.2d 17, 19, 54 A.L.R.2d 820,[7] we hold that the district court abused its discretion in denying the appellant Mitchell a separate trial.

The Government argues that a separate trial for Mitchell would have made no difference in the outcome, because "Mitchell was bound hand and foot by the most awesome array of evidence imaginable, quite apart from the confession of Barton." We cannot, however, substitute ourselves for the jury, whose duty it was to pass upon Mitchell's guilt or innocence. As was said in Kotteakos v. United States, 1946, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557:

> " * * * The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

It is not necessary for us to pass on the other claims of error. For the district court's refusal to grant a severance to the defendant Mitchell, the judgment of conviction against him is reversed and the cause remanded for a new trial of Mitchell.

Reversed and remanded.

---

4. Sixth Amendment to the Constitution.

5. See 23 C.J.S. Criminal Law §§ 933–939; 53 Am.Jur., Trial, Secs. 56–63.

6. Since Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, and Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed 158, that is, over the past thirty-five years, the Supreme Court, followed by lower federal courts, has employed a developing use of the due process clause of the Fourteenth Amendment as a means of asserting a sort of supervisory jurisdiction to assure fundamental fairness in state criminal proceedings. See "The Supreme Court, Federalism, and State Systems of Criminal Justice", by Professor Francis A. Allen, Vol. 8, University of Chicago Law School Record Supplement p. 3. That development serves to emphasize the primary duty of federal courts to keep in order their own houses by according to every defendant in a federal court a completely fair trial.

7. See also the extensive annotation appended to the report of that case in 54 A.L.R.2d 830, "Right to severance where codefendant has incriminated himself."