Dr. Rafael B. RIERRA, Appellant,

v.

UNITED STATES of America, Appellee.

No. 21589.

United States Court of Appeals
Fifth Circuit.

March 8, 1966.

George M. Leppert, G. W. Gill, New Orleans, La., for appellant.

Gene S. Palmisano, Asst. U. S. Atty., New Orleans, La., Louis C. La Cour, U. S. Atty., for appellee.

Before GEWIN and COLEMAN, Circuit Judges, and McRAE, District Judge.

COLEMAN, Circuit Judge.

The appellant was charged in a seven count indictment with using the mails in a scheme to defraud in violation of 18 U.S.C.A. § 1341. He was convicted on six counts and the jury was unable to agree on Count 6. He was sentenced to three years imprisonment on Count 1 and three years on each subsequent count, the latter to run concurrently with the sentence imposed on the first count.

Appellant complains of (1) denial of his motion for a bill of particulars; (2) of the admission of certain testimony as to what prompted the allegedly defrauded insurance company to launch an investigation in the case; (3) as to the denial of a verdict of acquittal for lack of sufficient evidence; (4) of the admission of certain business records; (5) of the failure to admit a purportedly impeaching statement made by the government's witness, Pruitt; (6) of allegedly prejudicial remarks of the trial judge; and (7) certain allegedly prejudicial remarks of the prosecuting attorney. We have carefully considered these contentions and do not consider that they are of sufficient merit to require discussion in this opinion.

The error assigned with reference to the admission of the hearsay statements of one Joseph Vinet that he was receiving "cuts" and "kickbacks" from the appellant in connection with the alleged scheme to defraud leave us no choice but to reverse and remand.

Appellant was charged with devising and intending to devise a scheme to defraud various insurance companies, more particularly The Home Life Insurance Company, and of using the mails in furtherance of the scheme. The insurance Company had a group major medical-expense policy which covered employees of Thomas Jordan, Inc. There was testimony that appellant prepared false invoices or statements of professional services, showing much more medical service to certain patients than had actually been rendered. He would have the patients bring in the insurance claim forms, then he would have them sign the form in blank on the front, and often on the back. The latter procedure would enable him to be paid directly by the insurance company, rather than have the company pay the patient. There was testimony that appellant would falsely claim numerous visits which, in fact, had not taken place. He would charge the insurance company for visits by patients who did not physically go to the doctor's office. If he sent medicine to a patient by another he would charge the company as for an actual visit from the person by whom he sent the medicine as well as charging for a visit by the patient who was not there. He would not give the patient a prescription for medicine to be filled in a drug store, but would dispense the medicine himself in unlabeled bottles, and when the patient came to get more medicine he would charge for that visit. One James Pruitt was charged with two office visits in August of 1959, at a time when Pruitt was out of the state on vacation. The Doctor claimed Pruitt had visited his office over seventy times for treatment, whereas Pruitt testified that he could not have possibly seen the doctor more than twenty-five times. Bills were sent for treating Pruitt's stomach trouble, when there was proof that he had not had any such trouble. The insurance company was billed for thirty-five visits by one Robert Champagne, whereas that patient testified that he could not have seen the doctor more than fifteen or sixteen times. There was much testimony of attempts by the appellant himself, or by others in his behalf, to get the witnesses to change their testimony after they had been before the grand jury.

When the insurance company began its investigation, in the Spring of 1960, the investigator assigned to the task examined Dr. Rierra's records. This alarmed the doctor and he wrote a letter

to the insurance company, in which he made the following statements:

"Attention: Group Claim Department Heads, or Executive Officers. Gentlemen, I have been lied about and put into an embarrassing position by one Joseph Vinet, a patient of mine. The matter is serious when considered with the fact that I myself have sent bills to your company which are open to question, in view of the fact that a number of the bills do not reflect the truth.

"Joseph Vinet has admitted to me that during the years 1959, and 1960, he often bragged to his fellow workers at Thomas Jordan, Inc. that he was receiving cuts and kickbacks from me on insurance money. That is a deliberate falsehood. It is entirely untrue. I deny this emphatically. I have spoken with some of the men that Joseph Vinet works with, and who are patients of mine, including his brother, Julian, and they have told me that Joseph had often repeated to them that he and I were close friends, and that Joseph claimed that we had an insurance deal wherein Joseph was making out all right through his own insurance claim, and from insurance claims paid me, and that he was getting a cut from me. I was shocked to hear this. I have never gave Joseph Vinet or any other patient one penny from any insurance money coming to me for services rendered and etc. Nor did I give Joseph Vinet any (gratuities) for referring the few patients he did. I am in the dark as to the motive of some of these patients who have directly told me that I did not see them or treat them at the time, or some of the times for which I have sent bills to your company. I am greatly concerned about this, because of the fact that a partial review of my books which I have made, shows me that some of their contentions are not wholly untrue. The fact of the matter is that there are a good number of times where I sent medicine by Joseph Vinet and by Robert Champagne and others to Mr. James Pruitt. I did charge for the medicine, but at the same time I also charged for a visit by the patient, Pruitt, who hadn't been here. This was done because my time was taken by the man by whom I sent the medicine. I frankly do not know the dates or the number of such charged patient's visits. I cannot understand how I came to put down visits and treatments at a time when I have been told by the patients themselves that they were on vacation outside of the state of Louisiana. In reviewing my records and bills to your company, I find that I cannot substantiate or support these bills.

"I have been further upset by the knowledge that Joseph Vinet has threatened to beat up those responsible for cutting off his kickback, (which never existed), and the fact that he went ahead and beat up Mr. Champagne. The fact that he did this has probably persuaded certain patients, erroneously, that Joseph did have a good thing, and of course is an untruthful remark, which I knew nothing of, can reflect unfavorably on me."

It will at once be seen that this letter went a long way toward being an admission of guilt and that the government could have relied on this letter as a most damaging piece of self-incrimination. The prosecutor, however, was not content to stop there. Over strenuous objection, he introduced hearsay evidence of what Joseph Vinet had said and done as will hereinafter be set forth. There was no indictment for conspiracy and Vinet was not named as co-defendant or as co-conspirator. When this case was argued at the Bar of this Court government counsel stated that Vinet was present at the trial, held under the rule as a witness, but the government did not put him on the stand because it did not wish to vouch for his credibility. Instead, by other witnesses, the prosecu-

tion proved what Vinet had said and done at times and places when he was not under oath, not subject to cross examination, and not subject to refutation by the appellant.

After proof of the various claims filed by Dr. Rierra and the introduction of the above letter, James D. Pruitt was called to the witness stand. He testified that in May of 1959, he went to Dr. Rierra to be treated for a skinned back, that he was taken to the doctor by Joseph Vinet. After detailed testimony concerning his various dealings with the doctor and visits from individuals who were attempting to get him to change his testimony in the case, James D. Pruitt was permitted to testify as follows:

**QUESTIONS BY ASSISTANT UNITED STATES ATTORNEY:**

"Q Did you ever hear Joseph Vinet make certain statements concerning Dr. Rierra?

A Yes, Sir.

Q What are the statements?

A Well, he used to go around telling everybody that he didn't have to work, that he was getting a cut from the Doctor".

This was objected to and there was a motion that it be stricken. Objection and motion were overruled. Then the following occurred:

"Q What other statements were made by Joseph Vinet?

A Well, he was telling everybody about the cut he was getting from the Doctor.

Q Cuts from what?

A From the insurance.

DEFENSE COUNSEL:

What was that?

THE COURT:

Insurance.

Q From his own?

A Sir, well, I will put it this way, just like he said. He said, "Well, I've got to get off, I have to go by the Doctor and pick up my cut." That is exactly the way he would say it.

Q He never used the word "kickback"?

A Yes.

Q On how many occasions, approximately, did you hear Joseph Vinet make a statement similar to the one you just said?

A Well, he said that all the time around everybody.

Q Did he make any statements in the presence of any other people?

A Oh, yes.

Q Where did he make the statements?

A Well, mostly when we were eating, all sitting down in the warehouse eating there. He would talk about it then."

Later on in the testimony of Pruitt, the following occurred:

"Q Do you recall an incident at Thomas Jordan's barge yard when a fellow employee was beat up?

A Yes, sir.

Q Who was that?

A Walter Champagne.

Q Did you see it?

A Yes, sir.

Q You were present?

A Yes, sir.

Q Who actually did the beating?

A Joe Vinet.

Q Do you know why he beat him up and—

DEFENSE COUNSEL:

Objection to that, Your Honor. I don't know what the answer would—

THE COURT:

Well, he might know.

DEFENSE COUNSEL:

He doesn't know the answer to that.

THE COURT:

Well, he might know.

DEFENSE COUNSEL:

I don't know.

THE COURT:

Well, the man who was doing the beating might have said why he was doing so.

DEFENSE COUNSEL:

Well, my objection goes to all this testimony.

THE COURT:

Well, let's see what he knows. You can answer that question from your own knowledge.

THE WITNESS:

Yes, sir. He said he beat him up about turning the Doctor in."

Later on, Dr. Francis T. Gidman was put on the stand, and the following testimony given.

"Q Did you bring any other records with you, Doctor? Did you have an occasion to see Walter Champagne on or about March 18, 1960?

A I have Walter Champagne's record here.

Q When did you see Walter Champagne?

A I saw him on three occasions. I saw him on March 18, 1960, October 6, 1960,—

Q Did you see him on or about March 18, 1960?

A Yes, I did.

Q What history did the patient give you at that time?

A Walter Champagne?

Q Yes.

A He gave me the history that he was struck in the face and head by a former employee while eating lunch at work.

Q Did you treat him for injury he sustained?

A I did.

Q What type of injury?

DEFENSE COUNSEL:

This has no application, if it please Your Honor, I can't see the relevancy.

THE COURT:

The objection is overruled.

BY THE ASSISTANT UNITED STATES ATTORNEY:

Will you answer the question, please?

THE WITNESS:

He had lacerations of the left ear, left cheek, nose, and left super-orbital region. This is the area above the eye.

BY THE ASSISTANT UNITED STATES ATTORNEY:

Do you have an opinion as to what could have caused these injuries?

A Of these?

Q What is your answer?

THE COURT:

He was told someone struck the man. Was the injury consistent with the history?

THE WITNESS:

Yes, sir.

BY THE ASSISTANT UNITED STATES ATTORNEY:

Q Did you treat him for those injuries?

A Yes, I did."

The government not only introduced testimony that Vinet beat Champagne but it proceeded to introduce cumulative testimony by showing that he received medical attention for the beating.

Then, Champagne himself was put on the stand and testified as follows:

"BY THE ASSISTANT UNITED STATES ATTORNEY:

Q Do you know of your own knowledge, why Joe Vinet went to Doctor Rierra's office on that occasion which you previously talked about?

DEFENSE COUNSEL:

Objection to anything he said. That would be hearsay.

THE COURT:

Overruled.

BY THE ASSISTANT UNITED STATES ATTORNEY:

Answer the question, please.

THE WITNESS:

I spoke to Joe that evening on the dry dock and he told me he was going to the Doctor, which I was too, to have his regular every day talk, and that he was going to the Doctor to get his cut. There had been some gossip around the

yard about he was getting a kickback, but I understood he was going there to get a check or cut of something.

BY THE ASSISTANT UNITED STATES ATTORNEY:

Q Did he actually tell you that, on that occasion?

A That he was going to get his cut, that's what he said he was going there for.

DEFENSE COUNSEL:

I think that is objectionable, Your Honor. I ask Your Honor for a mistrial.

THE COURT:

Counsel, I have to say now what I have in mind. In Doctor Rierra's statement, he refers to the rumors around the yard. He referred to the fact about this man that beat up someone. It was all in Doctor Rierra's statement that he himself made, so I think that this is admissible under the circumstances, although ordinarily it might not be.

DEFENSE COUNSEL:

I respectfully submit my motion for a new trial, and ask Your Honor to rule on the motion for a mistrial.

THE COURT:

Overruled."

It is beyond question that the statements of the doctor in his letter to the insurance company denying cuts and kickbacks to Vinet were subject to refutation by competent evidence. They could not be refuted by what someone said in the absence of the doctor and at a time when the declarant was not under oath and not subject to cross examination. Vinet was not a co-defendant or a named co-conspirator. And even if he had been a co-defendant, what he said and did at other times and places would have been incompetent except in a prosecution for conspiracy and only then after conspiracy first proven and for acts or statements in furtherance of the conspiracy.

On this appeal the government first seeks to save the conviction on the argument that this testimony was competent under Velasquez v. United States, 10 Cir., 1957, 244 F.2d 416. In that case, a government agent was concealed in the trunk of an automobile occupied by another agent and the defendant. At the trial the man in the trunk was allowed to testify as to the conversation he overheard between the defendant and the other agent. Of course, this was competent. The defendant was present and participating in the conversation. The case is just that simple. A conversation in which the defendant participates is not hearsay.

The government further says in its brief:

"In fact, the truth of the statements by Joseph Vinet concerning 'cuts' is not relevant to the question of what the appellant stated in the letter. If Joseph Vinet made the statements and they were false, the fact that he made them would still attest to the authenticity of the letter, particularly since the appellant maintains in his letter that the statements are false".

Upon examination this contention is seen to contain its own built-in paradox. However, the first answer is that there was no question about the authenticity of the letter. In the second place, even if it were disputed, authenticity could not be established by hearsay testimony of this kind.

It seems to us that the decision of this Court in Barton v. United States, 263 F.2d 894 (1959) is controlling here. There, a defendant was jointly tried for a violation of the Mann Act. Out of appellant's presence and hearing, his co-defendant had given an unsigned statement to an F.B.I. Agent accusing appellant of being the instigator or of acting with the co-defendant in every detail of the commission of each offense charged. The unsigned statement was admitted in evidence, but the trial court instructed the jury not to treat it as evidence against the defendant. The co-defendant, the maker of the statement, did not testify. The conviction was reversed and remanded because, in violation of the Sixth Amendment, appellant had been deprived of his Constitutional right to be confronted with the witness

against him for he had been afforded no opportunity to cross-examine the co-defendant as to the truthfulness of his many accusatory statements. See also, Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

Vinet, of course, was not a co-defendant or named as a co-conspirator. It is true that he did not give an unsigned statement to a government agent, but the principle is the same. The statements above recited alleged to have been made by Vinet, in effect and affect, made him a witness against the appellant and there was no opportunity to confront or to cross-examine.

We must say, however, that were the Constitutional question not present the conviction would have to be reversed on account of the admission of this hearsay evidence.

The case most nearly in point is United States, Appellee v. Cianchetti, Appellant, 2 Cir., 1963, 315 F.2d 584, opinion by Circuit Judge Kaufman. That case involved a conspiracy to violate the federal narcotics laws. The trial court admitted in evidence a conversation by third parties about one of the defendants, in which she was referred to as a thief, racketeer, loafer, no good, and the cause of her husband's ruination. The conviction was reversed and remanded.

The Court there relied on the decision of the Supreme Court in Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), which involved the admission in evidence of the signed confession of a proven conspirator given after his arrest and withdrawal from the conspiracy and containing references to another conspirator. Two of the cardinal elements there noted by the Supreme Court as relevant to the question whether the conspirator referred to suffered substantial prejudice were (1) the strength of the case against him independent of the hearsay statement, and (2) the clarity of the trial judge's instructions as to the limited use of the confession, which was properly admissible only against the declarant.

In Cianchetti, the Court pointed out that there were no limiting instructions given, and that it was questionable whether under all the circumstances a clear limiting instruction would have cured the error, even though the evidence against the defendant was substantial. In Paoli, four Justices of the Supreme Court were of the opinion that the admission could not have been cured by instructions.

In the case now before us, no instructions were given. Indeed, none could have been given because there is no theory on which this hearsay evidence in this particular case against the single defendant could have been rendered admissible.

We are aware of what the trial court said at the close of the trial, "I don't think I can remember any case in which there has been more chicanery and skullduggery, and attempts to thwart justice as there has been in this case. He not only involved himself, but his family, a young lawyer who is a member of an old respected firm, another lawyer who has himself in serious trouble because of this Defendant, this Defendant's attempt to thwart justice".

We can, and do, understand the revulsion which the eminent trial judge felt toward this situation. We, however, have every confidence in his ability to deal, according to the law and evidence, with every angle thus encountered.

The same considerations were present in Barton, supra. We quote from the opinion of the Court:

"The Government argues that a separate trial for Mitchell would have made no difference in the outcome, because 'Mitchell was bound hand and foot by the most awesome array of evidence imaginable, quite apart from the confession of Barton.' We cannot, however, substitute ourselves for the jury, whose duty it was to pass upon Mitchell's guilt or innocence. As was said in Kotteakos v. United States, 1946, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed.

1557: ' * * * The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand'."

Reversed and remanded.