Manuel **MENENDEZ**, Thelma Dasher Menendez, Aristedes Menendez, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 25163.

United States Court of Appeals
Fifth Circuit.

April 5, 1968.

Rehearing Denied May 8, 1968.

John Paul Howard, Carlton P. Maddox, Jacksonville, Fla., for appellants.

Joseph W. Hatchett, Asst. U. S. Atty., Jacksonville, Fla., Edward F. Boardman, U. S. Atty., Middle Dist. of Florida, for appellee.

Before BROWN, Chief Judge, CLAYTON, Circuit Judge, and CHOATE, Senior District Judge.

CHOATE, Senior District Judge:

The three defendants, Manuel and Thelma Dasher Menendez (Manuel's wife) and Aristedes Menendez (Manuel's brother), were convicted of violations under 18 U.S.C. § 1952.[1] The specific allegations were that on various dates the defendants did knowingly use a facility of interstate commerce (the long distance telephone)[2] between New York and Jacksonville to aid, promote and manage a lottery, said lottery being in violation of the laws of Florida (Fla. Stat. § 849.09, F.S.A.).

The points raised on appeal involve: the trial court's refusal to give protective instructions as to the use of Aristedes's extra-judicial statement, which contained references to the other two defendants, and the court's failure to order a severance in view of the statement; the court's instructions as to the elements of the crime; the production of FBI interview reports under the Jencks Act, 18 U.S.C. § 3500; the production of grand jury testimony; the admissibility of Aristedes's statements under the *Miranda* rule; the court's denial, in part, of defendants' motions for a bill of particulars and other discovery.

This court affirms the trial court as to the conviction of Aristedes, and reverses as to the convictions of Manuel and Thelma. The reversal is because the court failed to take protective measures to assure that Aristedes's statement would not be considered by the jury in connection with the guilt or innocence of Manuel and Thelma.

The basic evidence produced by the government was as follows:

Several lotteries, including one known as "totals," existed in the Jacksonville area in 1964 and 1965. The winning number for totals is the last two digits of the combined total liabilities of the twelve Federal Reserve Banks as of the close of business each Wednesday. There is but one winning number weekly, which is available around 4 p. m. each Thursday. The number, released by the Federal Reserve Bank of New York, did not reach Jacksonville through the newspapers until Saturday, or through the Jacksonville Branch of the Federal Reserve Bank of Atlanta until Friday or Monday of each week.

A witness from the Federal Reserve Bank of New York testified that each Thursday about 4 p. m. a person identifying himself as Menendez would call to

---

1. § 1952. *Interstate and foreign travel or transportation in aid of racketeering enterprises*
 (a) Whoever * * * uses any facility in interstate * * * commerce * * * with intent to—* * *
 (3) * * * promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2) and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

 (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling * * * offenses in violation of the laws of the State in which they are committed * * *.

2. The telephone is a "facility" within this section condemning the use of any facility with intent to carry on any unlawful activity. United States v. Winston, 267 F.Supp. 555 (S.C.N.Y.1967); United States v. Smith, 209 F.Supp. 907 (E. D.Ill.1962).

obtain the combined liabilities of the banks.

In order to show the use of an interstate facility, the government produced records of the New York and Jacksonville telephone companies showing a series of calls on Thursdays around 4 p. m. from a telephone number registered to Aristedes Menendez in New York to a telephone number registered to Manuel and Thelma Menendez in Jacksonville.

The key government witness was an accomplice, Aristedes's son-in-law (who did some of the phoning himself at Aristedes's request). He testified to calls made by Aristedes in New York to Manuel and Thelma in Jacksonville to relay the lottery number.

Thelma's son said he was a pickup man for the lottery, hired by his mother. Other relatives and friends testified concerning the Jacksonville end of the operation and Manuel's and Thelma's involvement therein.

### Extra-Judicial Statements of One Defendant Involving Co-Defendant—

Aristedes in New York had spoken with FBI agents in October 1965. When his written, unsigned statement was offered as evidence, defense counsel pointed out that it contained references to the co-defendants Manuel and Thelma and to their activities in requesting and receiving the totals numbers. Neither of them had been present when Aristedes had narrated the statement to the agents. The defense asked the trial court to instruct the jury that the statement was inadmissible as to Manuel and Thelma, or in the alternative, to strike or delete their names from the statement. The court refused these requests. No instruction limiting the consideration of the statement was given in the final charge to the jury.

It is well established that a confession made by one defendant implicating a co-defendant who was not present when the confession was made is inadmissible as to the latter. Any such statement is hearsay as to the non-declarant. Further, the non-declarant is helpless to subject the maker of the statement to cross-examination, unless the declarant voluntarily takes the witness stand, which Aristedes did not do in this case. Barton v. United States, 263 F.2d 894 (5th Cir. 1959).

Where that type of statement is admitted into evidence, the court must effectively instruct the jury at once, and not wait until the conclusion of the case, that the confession must be disregarded as evidence against the co-defendant.[3]

The Supreme Court stated the rule, in terms of co-conspirators, as follows:

"This Court long has held that a declaration made by one conspirator, in furtherance of a conspiracy and prior to its termination, may be used against the other conspirators. However, when such a declaration is made by a conspirator *after the termination of the conspiracy, it may be used only against the declarant and under appropriate instructions to the jury.*" Delli Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 297, 1 L.Ed.2d 278 (1957).

Here, where no conspiracy was charged, it was prejudicial error to admit the statement of Aristedes, in which Manuel and Thelma were mentioned, without immediate cautionary instructions to the jury.

No prejudicial error has been shown as to the other points on appeal as they relate to Aristedes. Nevertheless, in view of the re-trial necessary for Manuel

3. Of course, other choices are open to the trial judge. He may delete from the confession all references to the co-defendant not making the confession, if this is practicable, or he should order separate trials if justice requires. Delli Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Barton v. United States, 263 F.2d 894 (5th Cir. 1959); Schaffer v. United States, 221 F.2d 17 (5th Cir. 1955); United States v. Echeles, 352 F.2d 892 (7th Cir. 1965).

and Thelma, they will be discussed briefly.

#### Court's Instructions—

 Defendants contend that the court erred in not instructing the jury that the government must prove that a particular type of lottery, a "totals" lottery, existed in the Jacksonville area. It is to be recalled that the charge was using the telephone in the commission of a State offense. The court did sufficiently define the offense, namely, the carrying on of a numbers lottery, in violation of Fla.Stat. § 849.09, F.S.A. Moreover, the defendants never requested an instruction that the existence of a particularly named numbers lottery was an element of the crime charged. If there was error, it would not have constituted plain error under Rules 30 and 52(b), Fed.R.Crim.P.

#### Production of FBI Interview Reports under Jencks Act—

 It was established that in interviewing the witnesses the FBI agent had made notes or memoranda. He later made a report of the interview and threw the original notes away. The original notes were "not in as much detail" as the interview reports. The requests of defendants' counsel for these reports were properly refused.

To make such notes available it must appear that they in some way had been adopted or approved by the witness, which was not the case here. Cf., Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963). It was not contended that the notes were a recording or transcription "which is a substantially verbatim recital of an oral statement * * * recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e). In fine, the notes or reports were not statements as defined in the act.

 The aim of the Jencks Act is "to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349, 79 S.Ct. 1217,

3 L.Ed.2d 1287 (1959). The defense should not be allowed to use statements to impeach a witness which could not fairly be said to be the witness's own statement rather than the investigator's interpretations. Id. at 350, 79 S.Ct. 1217 at 1223.

#### Production of Grand Jury Testimony—

The defense timely sought the production of grand jury testimony of several government witnesses, for use in cross-examination, on the bases that: all the witnesses were related to the defendants; one of the witnesses was an accomplice; one of the witnesses said she had difficulty in remembering dates.

 Inherent in the denial of production of the grand jury testimony is a finding that no particularized need therefor was shown by the defense. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). This court is unwilling to characterize that finding as erroneous under the circumstances. Since proof of the charges against Aristedes was quite substantial, it is highly unlikely that the production of the grand jury testimony would have resulted in his acquittal, particularly in view of his rather extensive written statement. See Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

 Under Rule 6(e), Fed.R.Crim. P., disclosure of grand jury testimony is committed to the sound discretion of the trial judge. However, in deciding whether a case has been made for disclosure which outweighs the policy of secrecy, it is better practice for the trial court to inspect the grand jury testimony. In the re-trial of Manuel and Thelma this may be done. See Dennis v. United States, supra 384 U.S. at 873, 86 S.Ct. 1840, items 4 and 5.

#### Admissibility of Statement under Miranda Rule—

There were three occasions on which Aristedes spoke with FBI agents in New York. The first was when an agent

came to Aristedes's home on October 21, 1965. The agent testified:

"I went to his apartment * * *. I went in and talked with him and advised him, of course, of his rights; he did not have to speak to me, he had a right to an attorney. And I questioned him concerning calls made concerning the total liability number.

"He denied knowing anything about total liabilities and said that any calls that may have been made were family calls.

"He gave me no information at that time concerning being involved in any way in the total numbers."

The second occasion was October 26th when Aristedes came to the FBI office in response to a telephone request made by an agent. He was warned of his constitutional rights and executed a document reflecting the fact. See footnote 4 infra. The agent, who had spoken with Aristedes's son-in-law in the interim, told Aristedes that "he was not telling me the truth and that I would like for him to give me the truth of the situation." Aristedes then admitted that he had been securing totals numbers and telephoning them to Jacksonville, but he declined to sign a written statement until he had discussed it with his attorney.

One of the agents reduced the statement to writing, and on October 28th Aristedes again appeared at the FBI office in response to a telephone call. He signed a second document reflecting that he was given constitutional warnings.[4]

 It affirmatively appears from the record that Aristedes was given a full warning under the circumstances [5] on both the October 26th and 28th interviews, at which he voluntarily appeared and discussed the matters under investigation. His conversation after these warnings constituted a waiver of the right to remain silent and the right to have his lawyer present. "Waiver" here is used in its classic sense: the voluntary relinquishment of a known right. It further appears that at the

---

4. The warning documents signed on October 26th and 28th were as follows:

"VOLUNTARY APPEARANCE; ADVICE OF RIGHTS

Date: 10/28/65

Place: New York, New York

Time: 8:54 AM

I, Aristedes Menendez, have come to the New York Office of the FBI (Federal Bureau of Investigation) of my own choice to talk with Special Agents of the FBI about a crime which they are investigating. I know that I am not under arrest and that I can leave this office if I wish to do so. I also know that I have a right to say nothing at all, that anything I do say may be used in a court of law, and that if I do say anything about a crime I have a right at any time to talk with a lawyer of my own choice, or anyone else to whom I might wish to speak, before saying it. I have been told of these rights today by Special Agent C. Dale Schwant of the FBI.

Signed: Aristedes Menendez

Address: 480 Central Park W

Witnessed: C. Dale Schwant, SA,FBI

Jerome J. Pino, SA,FBI

[X] The interviewee read this warning
[ ] This warning was read to the interviewee"

---

5. Aristedes's ability to retain an attorney is not questioned. Apparently he had an attorney in his employ on October 26, 1965.

October 21st interview the investigation was exploratory and not at the "accusatory state," i. e., "in custody interrogation." Escobedo v. Illinois, 378 U.S. 468, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Evans v. United States, 377 F.2d 535 (5th Cir. 1967).

■ Certainly law enforcement agents can discuss a matter with a person who voluntarily appears without jeopardizing a later conviction of that person. To hold otherwise could lead to great hardship upon innocent persons who might be indicted because they were denied an opportunity to discuss and explain a situation to investigating officers.

### Bill of Particulars and Other Discovery—

Defendants have not shown that the trial judge abused his discretion in denying portions of the motion for a bill of particulars and other discovery motions.

■ One point deserves mention. On January, 27, 1967, about five months before trial, defendants moved for discovery and production of "all written or recorded statements or confessions, whether signed or unsigned made by the defendant." The government responded on March 1, 1967, that it was not aware of any such statements, but that if it were later determined that there were such statements, they would be furnished. Aristedes's statement, discussed above, was presented to the defense at the hearing on discovery motions just before the trial commenced, July 12, 1967. The government should have delivered the statement, of which it had possession since October 1965, well in advance of trial, even though the hearing on the discovery motions was postponed, at defendant's request, until just prior to trial time. However, Aristedes knew of the existence of his statement, it *was* produced prior to trial, and no prejudicial error was committed by the court in relation to the production of the statement.

### Conclusion

The judgment of conviction of Aristedes Menendez is affirmed; the judgments of conviction of Manuel Menendez and Thelma Dasher Menendez are reversed and this cause is remanded for a new trial as to them.