Pedro Luis Rodriguez y PAZ et al., Defendants-Appellants,

v.

UNITED STATES of America, Plaintiff-Appellee.

No. 28997.

United States Court of Appeals, Fifth Circuit.

June 29, 1972.

William A. Daniel, Jr., Miami, Fla., for Dulce Espinosa.

Gino P. Negretti, Miami, Fla., for Fernandez, Lum & Echavarry.

James E. Siff, New York City, for Jackson.

Lawrence E. Hoffman, Miami Beach, Fla., for Acosta.

Frank Ragano, Miami, Fla., for Rodriguez y Paz.

Max Kogen, Miami, Fla., for Inchaustegui.

Robert W. Rust, U. S. Atty., J. V. Eskenazi, Neal R. Sonnett, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge.

There were 13 defendants and 23 additional named co-conspirators in this complex and lengthy narcotics case, which concerns drug traffic activities in Miami, New York, Detroit, Nicaragua, South American countries, and elsewhere, and involving dozens of persons. Four defendants fled and were not tried. In a lengthy trial in Miami, Florida, ending June 23, 1970, one defendant was acquitted. The remaining eight—Paz, Raul Fernandez, Acosta, Lum, Echavarry, Espinosa, Jackson and Inchaustegui —were convicted under Count I, conspiracy to import heroin and cocaine.[1] Five of them—Paz, Acosta, Raul Fernandez, Echavarry and Inchaustegui—were convicted under Count II, transportation and concealment of cocaine.[2] All eight appeal.

We reverse the convictions under Count Two. As to several issues, we affirm. And we remand for an evidentiary hearing on the issue of the presence in the jury room of non-evidentiary material relating to drugs and drug traffic.

The government's evidence tended to show a conspiracy of the following general nature. The original actors were defendants Paz, Acosta and Raul Fernandez, who were associated together in drug activities in the New York area. Subsequently Paz and his wife, defendant Dulce Espinosa, went to the Central American city of Managua, Nicaragua,

1. In violation of 21 U.S.C. §§ 173 and 174.

2. In violation of 21 U.S.C. § 174.

which became their base of operations, while Raul Fernandez and Acosta began to operate principally out of Miami. Illegal shipments of drugs were brought into Miami from Managua and South American points, but principally from Managua, by young American women couriers who entered Miami with parcels of drugs strapped to their bodies. The usual payment to the courier was $1,000. The couriers also transported between Miami and Managua letters, funds, lactose (for "cutting" drugs) and even merchandise destined as gifts for Nicaraguan officials. Many of these young couriers were named as co-conspirators but not defendants. Defendant Anna Echavarry accompanied couriers on numerous flights between Miami and Central and South America and assisted in arrangements at these foreign points of origin.

The couriers were recruited by co-conspirator Frank Cocossa, assisted by co-conspirator Gloria Richards. Also Cocossa made several trips between Miami and Managua, where he met Paz a number of times, and he assisted in moving at least one shipment of drugs to New York. Cocossa had been brought into the operation by defendant Inchaustegui, whose activities were chiefly in Miami but who was at times in Managua. Inchaustegui also supplied expense money to couriers, received incoming shipments, and supplied lactose.

Defendants Acosta and Raul Fernandez were active at the Miami end. They supplied drugs to a New York group which included a number of co-conspirators and defendant Lucrecia Lum. Lum also transported, sold and guarded drugs. Defendant Jackson was a purchaser of the ring's drugs, based in the Detroit area. Also he assisted in transportation of drugs. Defendant Raul Fernandez was from time to time engaged in collecting monies due from purchasers.

Facets of the conspiracy were described in detail by several couriers, the recruiters Cocossa and Gloria Richards, two members of the New York group, and several government agents.

### 1.

There is no merit to the contention that there were multiple conspiracies rather than one. This is a question for the trier of the facts, Koolish v. United States, 340 F.2d 513 (8th Cir.), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965), and it is quite clear that there was sufficient evidence on which to submit it to the jury.

### 2.

The trial court erred in denying the timely motions of the Count Two defendants for judgment of acquittal on that count, which was the substantive count. Count Two charged that seven named defendants "did fraudulently, knowingly and wilfully receive, conceal and facilitate the transportation and concealment" of approximately six pounds, 10 ounces of cocaine on or about September 27, 1968, at Miami, in violation of 21 U.S.C. § 174. Five of the defendants were among those already described—Paz, Acosta, Raul Fernandez, Echavarry, and Inchaustegui. The other two were Norberto Fernandez, whose motion of judgment for acquittal was granted, and Mario Marrero, who fled and was not tried but was described in testimony as a participant in the conspiracy.

Evidence concerning this particular charge was that on September 27, 1968, a government agent, acting on information the contents of which were unrevealed, put under surveillance deplaning passengers coming into the customs enclosure of the Miami airport. He observed a female passenger, Denise Bethancourt, who had arrived on a Lanica Airline flight from Managua, Nicaragua. He noted that she was bulky around the hips. The agent intercepted her after she had made her customs declaration and had completed a customs inspection. She was searched by female inspectors, who found taped to her body,

underneath a girdle, six plastic bags of cocaine. Miss Bethancourt was wearing an "A-line" dress, a loose fitting dress that hangs from the shoulders and does not have a tight or fitted waist.

Prior to the arrival of the Lanica flight the agent checked the area outside of the customs enclosure at which vehicles park to pick up passengers and luggage, and noted a gold Buick Riviera and took its license number. Approximately two weeks before, while surveilling the Miami airport, the agent had observed the same Buick just prior to the arrival of the Lanica flight from Managua, Nicaragua. Also, in September, prior to September 27, the agent had observed the same automobile parked at the residence of Marrero in Hialeah, near Miami. There was ample testimony of Marrero's part in the conspiracy. After taking the license number on September 27, the agent had it checked and found that the car was registered in the name of Gilbert Roque at a Miami address which was shown to be the residence of defendant Acosta, a central figure in the conspiracy. Miss Bethancourt was not seen in or about the Buick at the airport or elsewhere. Her ticket stub showed that she had departed Miami on September 22, 1968.

At trial Miss Bethancourt claimed the privilege against self-incrimination and did not testify. There was no testimony by any of the other couriers, or the recruiters of couriers, or by anyone else, identifying her as a courier for this ring, or as even being in contact with or in the presence of any defendant or coconspirator, nor was the cocaine which she brought in connected by direct evidence to the conspiracy. In fact her name was mentioned in the testimony with respect to only this single incident at the Miami airport.[3]

■ To sum up, the evidence on the substantive count was this:

(1) Of a conspiracy, a facet of which was to import cocaine into Miami from Managua, Nicaragua, with testimony tending to show participation therein by each of the convicted Count Two defendants at either the Miami or the Managua end, or both;

(2) Of numerous shipments of cocaine made from Managua to Miami pursuant to the conspiracy and over a period of approximately a year, including September 1968;

(3) Of a *modus operandi* of shipment the same as that employed by Miss Bethancourt;

(4) Of the presence, in the vicinity of the customs area, of a gold Buick which had been seen earlier at the residence of a participant in the conspiracy and which was registered at the address of a central participant but in another name, and which had been observed at the airport prior to arrival of another flight from Managua.

This is not enough circumstantial evidence on which to convict. A jury could not reasonably conclude that the evidence excluded every reasonable hypothesis but that of guilt. Surrett v. United States, 421 F.2d 403 (5th Cir. 1970); Harper v. United States, 405 F.2d 185 (5th Cir. 1969). The possibility cannot reasonably be excluded that Miss Bethancourt was acting solely on her own behalf and had no connection with this ring, or that she was acting as part of another group. There is a suspicion that the Buick was at the airport to meet her, but it is no more than suspicion. The reason for its presence may have been innocent, and, if it was there as part of the conspiracy, the purpose of its presence was not necessarily connected with the arrival of Miss Bethancourt.

Meyers v. United States, 310 F.2d 801 (5th Cir. 1962), relied upon by the government, is no help to it. In that case the courier attempted to bring across an international bridge marijuana concealed in an automobile door. The codefendant was her husband. He was seen on the bridge less than two hours after his wife was stopped. In his possession was

---

3. Except for one other reference, which was stricken from evidence.

a cologne bottle, and the odor from it was similar to that of the heavily perfumed car driven by his wife. The marijuana was concealed in a position difficult to reach, and the inspector who retrieved it suffered scratches on his arm. Defendant, when arrested, had similar scratches on his arm, and was carrying a pair of gloves. No such nexus between courier and any defendant has been established in the present case.

### 3.

The case must be remanded for a limited post-trial hearing because of the presence in the jury room during the trial of two books, concerning drug traffic, drug problems, and people involved in drugs, that were not in evidence. The books were "Merchants of Misery," by J. A. Buckwalter, published by Pacific Press Publishing Association, Mountain View, Calif., and "Up Tight," by John Gimenez as told to Char Meredith, published by Word Books, Waco, Texas. "Merchants of Misery" was the more susceptible of influencing the juror. It concerns large-scale drug business carried on by criminal syndicates, which is the type of operation these defendants are claimed to have had.

The books were discovered on the seventeenth trial day, the last day of taking of testimony, when the trial judge and attorneys went into the jury room for the court to hear a legal argument out of the hearing of the jury. All defendants called the books to the attention of the court and moved for a mistrial, which was denied. The books were left in the jury room. A motion was made that they be obtained and the prefaces read into the record. The trial judge declined on the ground that to take the books away from the jury would only call attention to the problem. No inquiry was made of jurors to ascertain the extent, if any, that the books had been seen by members of the jury and discussed. Since no inquiry was ever made, the exact circumstances of the books being in the room were not established. The supposition is that one of

the jurors brought them from a church library in Ft. Lauderdale, since the name of the library appears in at least one of the books. No corrective or cautionary instruction was given when the books were discovered and called to the court's attention or when the jury was charged. However, at the end of the proceedings on the day of discovery the court instructed the jury not to read newspapers or listen to news broadcasts, and added this:

> Let me say one other thing. I hate to restrict you on your reading. However, until after this case is over, don't read anything, unless you get a letter from someone in your family. If you have to read any books or anything that might give you new and independent ideas about any of this matter, don't discuss it with each other.

Rather than being an instruction not to read extrinsic matter concerning the subject matter of the trial, this was subject to the interpretation that such reading was permissible so long as not discussed with other persons.

At the conclusion of the trial, after the verdict was rendered, the defendants requested the court to inquire of the jurors to determine who had checked out the books and the location of the library. The United States objected, and the court refused the request. The books before us are stipulated to be correct copies.

The defendants are entitled to a new trial unless it can be said that there is no reasonable possibility that the books affected the verdict. Farese v. United States, 428 F.2d 178 (5th Cir. 1970). In *Farese* the defendant was accused of interstate transportation of a fraudulent security. There was put in evidence an attache case which had a clean shirt in it. While examining the attache case the jury found $750 in cash in the shirt. There had been no testimony concerning any such sum—the only nexus was that the crime charged concerned monetary gain. This court reversed, applying the

test of whether it could be said there was no reasonable possibility that the extrinsic matter affected the verdict. In United States v. Staples, 445 F.2d 863 (5th Cir. 1971), cert. denied, Kellis v. United States, 404 U.S. 1048, 92 S.Ct. 710, 30 L.Ed.2d 739 (1972), law books had been left in the jury room. The judge interrogated the jurors and found that only one had examined the books, and what he had seen was not relevant to the offense on trial. The test, therefore, was satisfied. Here, as in *Farese,* the extrinsic matter does not go directly to the offense charged but to the type of conduct and activities on trial. Stoehr v. United States, 196 F.2d 276 (3d Cir.), cert. denied, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952), is no help to the government. In a criminal income tax trial, the jury saw a movie about gangsters with remote references to income tax matters. The defense made no showing sufficient to place on the judge a duty to inquire. In his charge the court instructed the jury to disregard movies.

In framing relief which will give due regard to the rights of the government and of the defendants, we follow the procedure outlined by Judge Simpson in United States v. Barson, 434 F.2d 127, 131 (5th Cir. 1970). We remand to the District Court with directions to conduct an evidentiary hearing to determine whether there is or is not a reasonable possibility that the books affected the jury's verdict, Farese v. United States, *supra.* Inquiry must be made into how the books reached the jury room; whether they were available to members of the jury and, if so, for how long; the extent, if any, to which they were seen, read, discussed and considered by members of the jury; and such other matters as may bear on the issue of the reasonable possibility of whether they affected the verdict.[4] The court

shall make and certify to us findings of fact and conclusions of law together with a transcript of the hearing. Our determination of whether to affirm the judgments of conviction or to reverse and remand for new trial will follow such certification. Jurisdiction of the appeal is retained in this court during the limited remand for the purpose stated.

4.

Upon conclusion of the direct examination of each of several government witnesses, various of the defendants moved for production of the respective witnesses' testimony given before the grand jury. In each instance the motion was denied. Some of the witnesses had read the transcript of their respective grand jury testimony in preparation for testifying at the trial. The ground asserted for production was defendants' claim that the testimony at trial was inconsistent within itself, inconsistent with other statements, and inconsistent with the indictment. On appeal the claimed inconsistencies are said by defendants to be of particular importance because at least some of the witnesses concerned were convicted felons, or narcotics addicts, users and pushers, or both, and at least some were named as co-conspirators but not defendants.

Since Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), this circuit has continued to adhere to the rule that the defendant must make a showing of particularized need to be entitled to inspect grand jury minutes. United States v. Jenkins, 442 F.2d 429 (5th Cir. 1971); United States v. Barson, 434 F.2d 127 (5th Cir. 1970); Posey v. United States, 416 F.2d 545 (5th Cir. 1969), cert. denied, Snowden v. United States, 397 U.S. 946, 90 S.Ct. 965, 25 L.Ed.2d 127 (1970); James v. United States, 416 F.2d 467 (5th Cir.

---

4. Factors which go into cutting a Gordian knot of this kind are discussed in the dissenting opinion in United States v. McKinney, 429 F.2d 1019, 1031 (5th Cir. 1970), which opinion, on rehearing, became one of two opinions of the majority, United States v. McKinney, 434 F.2d 831 (5th Cir. 1970), cert. denied, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

1969), cert. denied, 397 U.S. 907, 90 S. Ct. 902, 25 L.Ed.2d 87 (1970); White v. United States, 415 F.2d 292 (5th Cir. 1969), cert. denied, 397 U.S. 993, 90 S. Ct. 1128, 25 L.Ed.2d 400 (1970); Stassi v. United States, 401 F.2d 259 (5th Cir. 1968), vacated on other grounds sub nom. Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Nolan v. United States, 395 F. 2d 283 (5th Cir. 1968); Menendez v. United States, 393 F.2d 312 (5th Cir. 1968), cert. denied, 393 U.S. 1029, 89 S. Ct. 639, 21 L.Ed.2d 572 (1969). Our position is contrary to the rule established in some other circuits which dispense with a required showing of a particularized need. *See* United States v. Amabile, 395 F.2d 47 (7th Cir. 1968), vacated on other grounds sub nom. Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968); United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967). Unlike several courts, *see* Cargill v. United States, 381 F.2d 849 (10th Cir. 1967), cert. denied, 389 U.S. 1041, 88 S. Ct. 781, 19 L.Ed.2d 831 (1968); Schlinsky v. United States, 379 F.2d 735 (1st Cir.), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265· (1967), we have not read *Dennis* as equating an asserted need for grand jury minutes in order to impeach a government witness with the particularized need required for inspection. *See* Nolan v. United States, *supra;* Menendez v. United States, *supra.* While our decisions have stressed the need for maintaining the secrecy of grand jury proceedings, Nolan v. United States, *supra;* Menendez v. United States, *supra,* especially to prevent loss of testimony through fear of retaliation and to protect the independence of the grand jury, Posey v. United States, *supra,* we have recognized, as we must, the need for lifting the veil of secrecy when there is an actual discrepancy between a witness' grand jury and trial testimony. So that the grand jury's realm will be invaded no more than necessary we have approved as the initial step in response to motions for inspection an in camera inspection conducted by the district judge to discover any such inconsistencies. *See* Barson v. United States, *supra;* James v. United States, *supra;* Menendez v. United States, *supra.* Disclosure of grand jury minutes is thus a matter committed to the sound discretion of the district judge for evaluation in light of the particularized need alleged. In reviewing the exercise of that discretion, keeping in mind the desire for a balance between the need for secrecy and fairness to the defendant in presenting his defense, we have deemed relevant the availability of Jencks Act material as an alternative source of statements impeaching the witness whose grand jury testimony is sought. *See* United States v. Barson, *supra;* James v. United States, *supra;* Posey v. United States, *supra.*

We conclude that the trial judge did not commit reversible error in denying defendants access to the minutes. In reaching that view we bear in mind that the only asserted particularized need was the desire to search for impeaching material for use in cross examination, that as to some of the witnesses the trial judge made an in camera inspection of the minutes and found no inconsistencies, and that as to at least some of the witnesses defendants were given Jencks Act material for use in cross examination. We have pointed out that the policy of protecting individuals who have given information to the grand jury with respect to commission of crime is a wise one, but that "once the individual has been called as a witness at trial and his testimony made public, this principle in the run of the mill case is of slight if any weight." *Barson, supra,* 434 F.2d at 129. But this is not a routine case. The record is replete with evidence of organized crime and of misconduct of all sorts, and of far reaching and intricate criminal organization in many countries and in several parts of the United States, and some of the defendants were at large at the time of trial. As we pointed out in

*Barson,* when there is a compelling need for secrecy to protect individuals even fair play does not demand that a defendant be allowed access to the grand jury minutes for impeachment purposes. We have considered the fact that in this instance, as in *Barson,* the trial judge examined testimony of some government witnesses in camera (and found no inconsistency) but, with no apparent reason for the distinction, declined to examine that of other government witnesses of no less importance. Nevertheless, because of the other factors we have enumerated, we are of the view that the present trial judge's allowable range of discretion was not exceeded.

### 5.

 If admission into evidence of the cocaine brought into the country by Denise Bethancourt[5] was error, as to the conspiracy count it was harmless beyond reasonable doubt. There had been day after day of testimony by witness after witness of the details of bringing in shipments of cocaine in the same manner, and of the financing of and arrangements for the shipments, and of distribution of cocaine thus brought in. It was not reversible error for the jury to see the seized fruits of a single shipment that was not sufficiently tied to the Count One defendants. Similarly, if it was error to admit into evidence two packages of heroin purportedly sold by Paz to an undercover agent—and the question is a close one—it was not reversible. This was only one item of an overwhelming mass of testimony relating to Paz's involvement as a central figure in the conspiracy.

The volunteered statement by a witness that he had come to Miami with two marshals and with defendant Paz handcuffed to him was not reversible error. In context it was little more prejudicial than a statement that Paz had been arrested. While Paz had not testified and thus had not put his character in issue, there was not, as in Odom v.

United States, 377 F.2d 853 (5th Cir. 1967), a plain reference to a prior offense committed by a defendant; indeed, it is unclear whether the reference related at all to a different offense.

There is no merit to the contention of Acosta that a display of photographs from which witness Gloria Richards selected a picture of co-conspirator Jesus Alvarez was impermissibly suggestive.

Other contentions raised by defendants either do not require, or do not deserve, comment.

Affirmed in part. All convictions under Count Two are reversed. The case is remanded for the limited purpose of an evidentiary hearing, and jurisdiction of the appeal is otherwise retained.