Fikri BAYRAMOGLU,
Plaintiff-Appellant,

v.

W. ESTELLE, Defendant-Appellee.

No. 85–2862.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1986.

Decided Dec. 16, 1986.

Michael B. Bassi, San Francisco, Cal., for plaintiff-appellant.

Josanna Berkow, Deputy Atty. Gen., Blair N. Hoffman, San Francisco, Cal., for defendant-appellee.

Before WRIGHT and FARRIS, Circuit Judges, and LETTS, District Judge.*

LETTS, District Judge:

Fikri Bayramoglu appeals from the district court's denial of his habeas corpus petition. Bayramoglu contends that juror misconduct and bias tainted his conviction in state court for second degree murder. We affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND [1]

### I. THE CRIME

Bayramoglu, a Turkish immigrant, moved to the United States in 1973. In 1978 he met Tracy Lee Jones, the victim. Soon after they met they began living together in San Rafael, California. Early in 1980, Jones moved away to care for a family member who was ill. Bayramoglu became upset and depressed.

On April 17, 1980, Jones visited Bayramoglu in his apartment. According to Bayramoglu, Jones was on the bed and noticed that Bayramoglu was shaking. Jones asked what was wrong, and Bayramoglu said that he was going to kill himself. Jones responded, "No, you're not." Bay-

---

* Hon. J. Spencer Letts, District Judge, Central District of California, sitting by designation.

1. This background information is taken largely from the California Court of Appeal's unpublished opinion in *People v. Bayramoglu*, No. A019827 (filed May 24, 1984).

ramoglu said, "Yes, I am," took a .32 caliber pistol from behind his back, and shot Jones several times. He put the gun to his own head and squeezed the trigger, but the gun did not fire. Bayramoglu then tried to plunge a large kitchen knife into his heart.

When Bayramoglu thought he heard Jones say something, he ran across the street to a store to try to get help for her. He asked the people in the store "to go help Tracy, to try to save her." Bayramoglu was screaming that he wanted to die, that he had killed Jones and wanted to kill himself. He told the paramedics who came to treat him to stop helping him and to go help Jones. He kept repeating this for about ten minutes until an ambulance arrived.

The district attorney filed an information on March 22, 1982, charging Bayramoglu with first degree murder, use of a firearm in the commission of that offense, and being armed with a deadly weapon. Bayramoglu pleaded not guilty and not guilty by reason of insanity, and denied the enhancement allegations.

## II. JUROR MISCONDUCT AND BIAS

Jury trial began on July 1, 1982,[2] in Marin County Superior Court. At trial Bayramoglu sought a verdict of either not guilty by reason of insanity, or manslaughter. At some point prior to the jury's deliberations, and without the court's knowledge, one juror, Virginia Digesti, visited the courthouse law library "to solve some questions in [her] mind," apparently about the distinction between first and second degree murder and the attendant penalties.[3]

On August 6, the jury retired to deliberate. On Monday, August 9, the jury sent the trial judge a note stating that the jury had unanimously agreed on the presence of intent and malice, and therefore could agree that the defendant was guilty of at least second degree murder, but appeared to be deadlocked on the issues of premeditation and deliberation.

A portion of this note had been crossed out. The second sentence, before the crossing-out, read as follows: "However, the jury is divided on premeditation and deliberation, and *several of them feel that they could not agree on a verdict other than first degree murder, and we* may be deadlocked on this point." (Stricken language emphasized.)

The next morning, August 10, the judge told counsel that he had learned that a juror may have asked the courthouse law librarian about "the law, capital punishment, degrees of murder, parole eligibility, et cetera." The judge ordered the jury to cease deliberating, and then conducted an *in camera* conference with the law librarian, Meyer Halprin. Halprin, under oath, testified as follows:

A  I answered the telephone. A woman's voice asked me if there was capital punishment in the State of California.

Q  What time was this, about?

A  This occurred about—approximately 10 after 10:00, somewhere around there. . . .

The telephone conversation—the caller said, "Is there capital punishment in California?" I said, "Yes." The caller said, "Can you tell me the difference between first and second degree murder?" I said, "That depends on the circumstances." We then had an exchange about the difficulty to tell the difference between first and second degree murder, because there sometimes isn't the agreement between the experts. "Yes" she agreed, and then she asked me directly in second degree murder if a person is eligible for parole. I said, "That's up to the parole board to decide." She said, "You know, I was in yesterday. . . ."

I think she said, "yesterday[.]

". . . and couldn't get the answer to this question. It is very difficult for me to get an answer to this question. I need

---

2. All dates are in 1982 unless otherwise indicated.

3. Digesti was accompanied on this library visit by another juror, Lucille Hanson, who was excused on August 2 because of illness.

to know this," she said, because she wants to do the right thing, and she wants to help others also to understand it better, and she said, "Since I can't get an answer, I'll go back to my business," and then I said, "What is your business?," and she said, "I'm a Marin—a juror here in Marin," and I said, "In a murder case?," and she said, "Well, then, I—I can't say that. I would be discussing it with you." I said, "Well, I see. Actually this matter should be brought before the Court, because they can give you the proper answer to your question," and she said that she would then send an inquiry into the Court. She would then ask for the Judge, she said, to give them a definition of first and second degree murder.

After Halprin had testified to this conversation, the trial judge, with counsel's consent, spoke privately with all of the jurors as a group. The judge told counsel later that he had asked, "gently," whether anyone had spoken to the law librarian and that all had denied taking part in such a conversation. The judge then questioned the jury foreman alone, who related that one of the jurors, whom he identified by first name, physical appearance and position in the jury box, had during deliberations "mentioned that first degree murder would be, in this instance—could be anywhere from 15 years to life, if I recall correctly; 15 years to something, whether it is life or—or another number."

Digesti was then brought into chambers and questioned by the judge, in counsel's presence. In response to the judge's questions, Digesti admitted that she had spoken to the librarian, and explained her motives and the extent to which she had shared this information with her fellow jurors:

JUROR DIGESTI: [Y]ou know, to make a decision of first and second degree, I didn't know that that was so bad to ask a question. I wanted to ask you about this, because if you say, "Is it first degree," and if I don't know what the penalty maybe [sic]—I'm not supposed to be concerned about this, but I am concerned in my heart that I want to know. . . .

THE COURT: Let me just tell you the law says that you cannot be concerned with that, and we were having a discussion, the two attorneys and myself, just the other day about this kind of a problem, when the jurors are required to make a decision, you know, and not knowing the impact of it, which is what you were concerned about—

JUROR DIGESTI: Yes.

THE COURT:—as you have indicated, and it is a very natural concern, but it is one of the things that the law does not permit, whether it is natural or not, and the law has reasons why it does not permit decisions to be based, or factors to be considered, such a factor of punishment. It is just that you can't consider it.

Could you tell me where you got that information, and what was the amount of the sentence? What information did you get?

JUROR DIGESTI: Yes. What bothers me so badly is if I—if in our discussion, just openly—if in our discussion we decide on first degree murder, in my mind, I read someplace before ever this happened, that first degree involves the death penalty, and the death penalty is still available in California, but it involves 15 years to life. These facts just hit me in the back of the head. I kind of pulled it out for first degree, but I never did remember anything about reading about what second degree—

THE COURT: Did you find out anything?

JUROR DIGESTI: No, nothing different than that.

THE COURT: The only information you disclosed to the jury was the information of 15—

JUROR DIGESTI: I didn't really do that. I asked the question when I went in this morning. I wanted somebody to help me with that, and I couldn't find it, and I said, "Could somebody tell me what the difference is between first and second degree?," and nobody said, and

then a little lady in there said she thought 15 years to life, and I had remembered reading that, and I said, "I do remember reading that, but is second degree?," and nobody knew.

. . . .

THE COURT: [Y]ou were more concerned, then, with finding out what second was?

JUROR DIGESTI: I wanted to know that. Nobody knew. I asked if we could send a note to ask, and they told me, and then I realized, this is bad, because they said, "It is not your concern. You are not to be concerned about that." It is so hard not to be concerned.

THE COURT: We understand it is a very natural response to be concerned. It is just that they are right, the law says you cannot consider that.

Digesti went on to say that there had been no prior discussions among the jurors concerning the possible penalties for different degrees of murder. She also admitted that she had visited the law library once but had not found anything and had not disclosed anything about this event to any of the other jurors.

After Digesti had left the judge's chambers, defense counsel moved for a mistrial based on her misconduct. The judge offered to remove Digesti and replace her with an alternate, but counsel argued that the jury was contaminated.

After lunch this same day, Digesti was again questioned *in camera,* and stated that she could put the issue of penalty out of her mind in her deliberations, and that she would not again seek any such information during the deliberations. Defense counsel renewed his motion for a mistrial. He stated that if his motion were denied, he requested that "all of the jurors be voir dired as to their ability to sit fairly." The judge agreed to question each juror, and told counsel that after those interviews he would rule on the mistrial motion.

Each juror was then brought into chambers, in the presence of counsel. The judge asked each juror (1) whether he or she had heard Digesti make any remarks about penalties; (2) whether anyone had respond-

ed to Digesti's remarks; and (3) whether he or she could refrain from considering penalties when deliberating over the defendant's guilt or innocence. All jurors said they had heard Digesti's remarks, most said they had heard responses to the effect that the jury was not supposed to consider the penalty in reaching a verdict, and all swore they could be fair and impartial notwithstanding this mention of penalties.

After these interviews were completed, defense counsel renewed his mistrial motion. The judge again denied the motion, but offered to excuse Digesti from the jury. Defense counsel, after consulting with Bayramoglu, declined the court's offer, arguing again that the jury had been contaminated. Defense counsel also explained that because the jury foreman had apparently indicated that Digesti was one of the jurors who "is not agreeing to a first degree verdict," he could not agree to her removal because he had to "insulate my client from a conviction of first degree murder."

Because neither counsel wished her to be removed, the court did not at that time excuse Digesti as a juror. The judge again instructed the jury not to discuss or consider the subject of penalty or punishment, and they resumed deliberations.

On the morning of August 11, the jury heard a readback of the testimony of Dr. Blinder, a psychiatrist who had testified for the defense. At 2:30 the judge received a note from the jury foreman which indicated that all jurors had agreed that the elements of second degree murder had been proved, but that "one juror is opposed to such a verdict, maintaining that premeditation and deliberation has also been established. This juror will agree only to a first degree verdict, period." The judge denied defense motions for a mistrial and for a polling of the jury, and the prosecution's offer to amend the indictment to charge only second degree murder was rejected. The judge sent the jury a note suggesting that they continue deliberating.

On Friday morning, August 13, the judge called counsel into chambers. He informed counsel:

Last night I got a call, about 9:00 o'clock from our juror, Mrs. Digesti. She had just had a call from Fikri [Bayramoglu], who indicated that she has his life in her hands, et cetera, et cetera. I then told her to forget the statement, and not to worry about it, not to consider it in her deliberations, ... not to discuss the matter with any other jurors, ... and to reject the contents of the call.

At 9:50 this morning Miss Brown, one of our regulars, and she was an earlier alternate, came in very upset, and said she just had to talk to me, and this is what she disclosed to me:

On the first day of deliberations one of the members of the jury emphatically stated that she would not accept anything other than first degree murder. Then after we had our upset about the sentencing a couple of days ago, and interviewed all of them individually, and went through the problems of mistrials, et cetera—after that discussion the same juror who had indicated that the juror would not accept anything, or vote for anything other than first degree, related the following to the jury:

Several years before her husband had been killed in an accident; wasn't sure it was an automobile, or what. As a result of the emotional distress of that incident that juror could not sleep, et cetera, for several days. As a result of that she put a gun under her shirt, her blouse, went into the bathroom of the family residence, where her son was shaving, took the gun out, and aimed it at her son, and I guess—it wasn't clear, but he somehow became aware of it, turned around and said, "Go ahead and shoot, mom." She did not do it. I guess the statement or something prevented her from doing it.

Yesterday this same juror indicated, I guess during their deliberations, to the effect, quote, psychiatrists should be out of the legal system, unquote. She agreed with Doctor Coleman [a psychiatrist who testified for the prosecution].

The bottom line of these two contacts by jurors to the Court was, when I asked Miss Brown this morning who that juror was about whom she related all this to me, that juror was Mrs. Digesti.

Later that day, Brown was brought into chambers and asked about what had occurred. She reported Digesti's remarks about psychiatrists and about her son essentially as the judge had related them.[4] Bayramoglu's attorney renewed his motion

---

4. The Brown conference was reported as follows:

THE COURT: Could you tell us what you recall her saying, and whether it was to you directly, or was it just to the jury, in its discussions.

JUROR BROWN: Okay. We were sitting there, and we weren't deliberating. We had been deliberating, maybe, at the most, an hour and a half, and we were starting to talk about intent, and—when we deliberated—intent, and various things, and it was brought up that, "Well, you know, second degree murder is," this, this, and this, and she said—she spoke to me, and with one person sitting between us, and I don't know who overheard it, but she said she would not vote for anything less for [sic] first degree murder....

THE COURT: Would you tell us what she mentioned about her son?

JUROR BROWN: The day before yesterday we were all still deliberating, and at some point she said, "Well, let me tell you all a story," and we—we still didn't know what the point of it was she was trying to make. She

said, "When my husband was killed a number of years ago," she said, "I was sitting at home, and I hadn't eaten for about four days. I was depressed." And she said, "We had guns in the house all of the time," and, she says, "I went and got a gun, and my son was in the bathroom shaving, and," she said, "When I cocked the gun, and I was pointing it right at his head, he turned around and said, 'Go ahead and shoot, mom,' and went right back to shaving."

Well, she says that the fact that he spoke to her stopped her from doing it, and then she went back out to put the gun away. She said she had concealed it, and everything, in one of her husband's shirts that she was carrying around at the time....

MR. DAVIS [DEFENSE COUNSEL]: [To the Court] Okay. You also indicated that Mrs. Brown had told you that Mrs. Digesti expressed a negative opinion about psychiatrists in court.

JUROR BROWN: Right.... We were talking about pros and cons of psychiatric testi-

for a mistrial, arguing that "as a practical matter there is no way that [the jury] can begin deliberations without being influenced by what has already happened. They have been contaminated by Mrs. Digesti's presence, by her bias." The Court denied the motion for mistrial but excused Digesti from the jury pursuant to Cal.Penal Code section 1123.[5]

The judge and counsel discussed various procedures for resuming jury deliberations with an alternate in Digesti's place. The court decided to instruct the jury regarding their general duties when an alternate is added, and their specific duty to disregard any consideration of punishment or penalty. An alternate juror was then selected, and the court instructed the jury as he had indicated.[6]

The reconstituted jury began its deliberations at 11:39 a.m., and at about 3:20 p.m. returned a verdict of guilty of second degree murder. The sanity phase of the trial began on August 17. After counsel had argued, the jury retired to deliberate at 11:25 a.m. At 2:25 p.m., the jury announced its finding that Bayramoglu was legally sane at the time he committed the murder.

Bayramoglu's motion for a new trial was denied on September 21. He was sentenced to state prison for a term of fifteen years to life. The California Court of Appeals affirmed his conviction, and the California Supreme Court declined to hear his appeal. Bayramoglu then filed a petition for a writ of habeas corpus in federal district court. The district court denied his petition. Bayramoglu now appeals from the district court's judgment.

## STANDARD OF REVIEW

We review *de novo* the district court's denial of Bayramoglu's habeas cor-

---

mony during the deliberation yesterday, and someone had said, "Well, Dr. Coleman has a different opinion," and Mrs. Digesti said, "Well, I agree with Dr. Coleman. I don't believe that psychiatrists should be in the judicial system...." Honestly, I think some other people heard these comments.

5. Cal.Penal Code section 1123 provides that the court may discharge a juror who "upon ... good cause shown to the court is found to be unable to perform his duty." The court's stated reasons for discharging Digesti included her failure to disclose important information in connection with qualifying as a juror during voir dire, her independent research into penalties and sentencing, and her telephone contact with Bayramoglu.

6. The judge instructed the jury as follows:

All right. At this time, again, I just want to give admonitions.

One, again, we want to reiterate to you that under no circumstances in your deliberations are you to consider anything in connection with the concept of penalty, punishment, sentencing, parole, or any of those matters.

I'm also going to ask Mr. Lee, as our foreman, to, when you go back into the jury room, start up anew your deliberations. That you read the notes that you have been accumulating, which you sent to me, after which I wrote back, after consulting the attorneys, and appropriate response, so that [the alternate] will be starting off at the same starting line as all of you, and we also indicate to you

and the jury that you do have the transcript of the Court's instructions now in the jury room with you. Those maybe [sic] reviewed in total or in part, as deemed appropriate by the jury, since you have all been orally instructed by the Court in initial instructions to the jury.

I'm now going to read to you an instruction as provided for by the higher Courts when we have a change in jurors such as we have at this time, and that instruction reads as follows.

One of your number has been excused for legal cause and replaced with an alternate juror. You must not speculate or consider for any purpose the reasons for such excuse. The People and the defendant have a right to a verdict reached only after full participation of the 12 jurors who will ultimately return the verdict. This right maybe [sic] assured in this case only if the jury begins its deliberations again from the beginning. You are, therefore, instructed to set aside and disregard all past deliberations, including any notes that you may have accumulated as jurors during your deliberations, and to begin anew deliberating.

This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place.

You shall now retire for your deliberations in accordance with all of the instructions that we have previously given to you.

The instruction read by the court regarding general duties of jurors when an alternate has been substituted is essentially identical to California form instruction CALJIC 17.51.

pus petition. *Weygandt v. Ducharme*, 774 F.2d 1491, 1492 (9th Cir.1985). Whether jurors can "render a verdict based on the evidence presented in court ... is a determination as to which habeas courts owe special deference." *Patton v. Yount*, 467 U.S. 1025, 1037 n. 12, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984). The state court's conclusion that jurors can be impartial may be set aside only if it lacks "fair support in the record." *Id.* at 1038, 104 S.Ct. at 2892.

## DISCUSSION

### I. JUROR MISCONDUCT

██ Bayramoglu claims here, as he did in his state appeal, that he was prejudiced by the misconduct and bias of juror Digesti due to the effect on the entire jury of Digesti's remarks. A state defendant has a federal constitutional right to an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to jury trial); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (due process right to trial by impartial jury). Jurors have a duty to consider only the evidence which is presented to them in open court. *See Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965); *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir.1981) (per curiam), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

██ Once a juror has breached this duty by infecting the deliberations with extrinsic material, a new trial is warranted if there is a "reasonable possibility" that it could have affected the verdict. *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). The ultimate question is " 'whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict.' " *United States v. Bagley*, 641 F.2d

1235, 1241 (9th Cir.), *cert. denied*, 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981) (quoting *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir.1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981)).[7] "[N]ot every incident of juror misconduct or bias requires a new trial." *United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

The Fifth Circuit has listed five factors courts should consider when adjudicating challenges based on a juror's injection into deliberations of extrinsic material: (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict. *See Paz v. United States*, 462 F.2d 740, 746 (5th Cir.1972), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 52 (1973); *United States v. Castello*, 526 F.Supp. 847, 850 (W.D.Tex.1981).

Here, as indicated above, the trial judge conducted lengthy and detailed examinations of each juror concerning the circumstances and effect of Digesti's misconduct. These examinations revealed that the extrinsic material concerning the possible penalty for first and second degree murder was obtained (albeit not entirely accurately) by Digesti through her contact with librarian Halprin. Digesti herself raised the issue of penalties by asking whether anyone knew what the possible penalties were. The issue died quickly, within one or two minutes, when the other jurors said that they should not be talking about the subject.

This brief mention of penalties occurred relatively early in the "first" deliberations,

---

**7.** The "reasonable possibility" test is equivalent to the harmless error rule for constitutional errors. *Bagley*, 641 F.2d at 1241.

before Digesti's removal from the jury. After Digesti's removal, the jurors were instructed to deliberate anew and to disregard all prior discussions. They were also expressly told not to consider the issue of penalty or punishment. Although not determinative, it is certainly significant that each juror assured the court that he or she could disregard any consideration of penalties when considering Bayramoglu's guilt or innocence. *See United States v. Shapiro*, 669 F.2d 593, 601 (9th Cir.1982). As the California Court of Appeal noted:

> [T]he record shows that other jurors rejected and ignored Mrs. Digesti's efforts to share with them the fruits of her legal research efforts and she was replaced on the jury, which then commenced deliberations anew before it arrived at a verdict. We think it highly unlikely that the other jurors were persuaded by anything she had to say.

As the district court pointed out, the juror misconduct in this case, while serious, does not rise to the level of that found in other cases where reversal was warranted. For example, in *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir.1980), the panel reversed a federal conviction where a United States Deputy Marshal conveyed to the jury substantive information on sentencing and the resulting discussion was "extensive." In *Gibson*, 633 F.2d at 852–55, we reversed the denial of a habeas petition where a juror conducted independent research into the rarity of a certain blood type, an issue crucial to the defendant's guilt to innocence, then shared the information with the rest of the jury. And in *United States v. Vasquez*, 597 F.2d 192, 194 (9th Cir.1979), we reversed the denial of a habeas petition where the official court file, containing inadmissible evidence, had been left in the jury room during deliberations and most jurors had examined it.

The facts in this case are closer to those in *Bagnariol*, 665 F.2d at 888–89, where

we held that a juror's misconduct in doing library research was not prejudicial because the research itself was irrelevant and immaterial to the information ultimately conveyed. There, we noted that "we discern very little difference in statements that [the juror] could have offered had he not checked the library and those he actually made after the visit." *Id.* at 889. We agree with the district court that "[a] similar observation is appropriate in this case."

It is also relevant that the trial judge gave a curative instruction to the newly-constituted jury to disregard penalty or punishment when considering guilt or innocence. "A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate." *United States v. Berry*, 627 F.2d 193, 198 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981).

▇▇▇ We therefore conclude that Digesti's misconduct was harmless beyond a reasonable doubt; that is, that there is not a "reasonable possibility" that her brief introduction of the subject of penalties affected the jury's ultimate verdict of guilty of second degree murder. *See Fahy*, 375 U.S. at 86–87, 84 S.Ct. at 230; *Bagley*, 641 F.2d at 1241.

## II. JUROR BIAS

▇▇▇ The existence of juror bias may violate a defendant's Sixth Amendment right to a fair and impartial jury. *See United States v. Eubanks*, 591 F.2d 513, 516–17 (9th Cir.1979). We must determine whether Digesti's bias resulted in the denial of a fair trial. *See Id.*; *Hendrix*, 549 F.2d at 1227.

▇▇▇ While neither the trial court nor the state appeals court analyzed the bias issue separately from the misconduct issue,[8] the district court appropriately re-

---

**8.** We nonetheless believe that by examining each juror at length, on the record and in the presence of counsel, and giving each counsel the opportunity to speak and ask questions, the trial court fulfilled the requirement of providing a

hearing "with all interested parties permitted to participate," as contemplated by *Smith v. Phillips*, 455 U.S. 209, 216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982).

viewed this claim[9] "based upon the state court trial record and adopt[ed] detailed findings." *Butcher v. Marquez,* 758 F.2d 373, 376 (9th Cir.1985). The district court concluded that there was "substantial evidence" of Digesti's bias, as indicated by her personal experience with pointing a gun at her son[10], and by her declaration on the first day of deliberations that she would accept only a first degree murder verdict. Her comments about psychiatrists would also appear to indicate bias.

 We agree with the district court that any possible problem with Digesti's bias was ameliorated by her removal from the jury and the trial court's instruction to the reconstituted jury to begin deliberations anew. The facts do not support Bayramoglu's argument that he was, despite Digesti's removal, prejudiced by her bias. *See Shapiro,* 669 F.2d at 599 (removal of biased juror may not remove prejudicial taint). First, the jury ultimately returned a verdict of second, not first degree murder; thus, they apparently were not influenced by Digesti's insistence on first degree. As has been noted, the jury foreman sent a note to the judge during trial that they had "agreed unanimously that intent and malice aforethought ha[d] been established," but that "one juror is opposed to such a verdict, maintaining that premeditation and deliberation ha[d] also been established." Further, Bayramoglu's argument that Digesti's apparently unyielding position on first degree murder "influenced the group dynamics" so as to prevent any discussion of manslaughter is pure speculation. "[S]omething more than such an unverified conjecture is required to justify grant of a new trial." *United States v. Barber,* 668 F.2d 778, 787 (4th Cir.) (citing *Hendrix,* 549 F.2d 1225), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). Nor can we discern any prejudicial effect arising from Digesti's recounting of the story about her son, or her statement of opinion about psychiatric testimony.

We therefore conclude that there was no prejudice to Bayramoglu as a result of Digesti's biases. *See United States v. Sears,* 663 F.2d 896, 900 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982).

## CONCLUSION

The district court's denial of Bayramoglu's habeas corpus petition is AFFIRMED.

---

**9.** The facts underlying the bias claim were fairly presented to the appellate courts, thus satisfying the requirement that state remedies be exhausted. *See Kim v. Villalobos,* 799 F.2d 1317, 1319 (9th Cir.1986) (citations omitted).

**10.** As the district court noted, citing *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977), "[t]he potential for substantial emotional involvement may adversely affect impartiality."